*Decision will be entered under Rule 50.*

PORTLAND COPPER & TANK WORKS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 90564.    Filed November 17, 1964.

---

[5] The gain should be computed as follows:

$$\text{Petitioner's gain} = \frac{\dfrac{333,333.33}{2} - \text{Value of usufruct} - \text{Remaindermen's uniform adjusted basis}}{9}$$

*John M. Doukas*, for the petitioner.
*Albert Doyle* and *Harold Arcaro*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency of $449,413.94 in petitioner's income tax for its fiscal year ended January 31, 1959. The issue for decision is whether in computing its taxable income, petitioner properly reduced its gross sales for its fiscal year 1959 by the sum of an amount which it had proposed as a refund to its principal customer under price redeterminable contracts and an amount which it had estimated as the refund applicable to other such contracts.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Portland Copper & Tank Works, Inc., hereinafter referred to as petitioner, is a corporation organized under the laws of the State of Maine with its principal office at 80 Second Street, South Portland, Maine.

Petitioner filed its Federal income tax return for its fiscal year ended January 31, 1959, with the district director of internal revenue for the district of Maine.

At all times material hereto, petitioner kept its books and accounts and filed its Federal income tax returns on an accrual basis of accounting.

Petitioner is a manufacturing company which engages in subcontract work for other contractors who furnish military and defense products to agencies of the U.S. Government. During the year here involved, petitioner's principal activity was the manufacture of jet engine components as a subcontractor for the General Electric Co., hereinafter referred to as General Electric.

General Electric contracted with petitioner for production of specific items by means of purchase orders stating fixed prices, arrived at by negotiation of the parties. The purchase orders were subject to a General Electric "Price Redetermination Supplement Applicable to United States Government Contracts and Subcontracts."

Under the price redetermination supplement, the fixed prices shown on the purchase order were subject to change through negotiation at a future time. This redetermination supplement provided in part:

(3) *Times for Negotiation.*

(a) At the time indicated or upon completion of delivery of the per-cent of the items to be furnished under this contract as stated on the face of the order, the parties shall negotiate to revise the prices of all items theretofore and thereafter to be delivered. Not more than thirty days after the time indicated or the completion of delivery of the percent, as stated on the face of the order, the Seller shall furnish to the Buyer the statements and data referred to in Clause (5) of this Supplement. * * *

(b) For the purposes of the first negotiation contemplated by this Clause, the date of execution of this contract shall be deemed to be the effective date of the price revision. * * *

*     *     *     *     *     *     *

(5) *Submission of Data.*—At the time or each of the times specified or provided for in Clause (3) of this Supplement the Seller shall submit (i) a new estimate breakdown of the unit cost and proposed prices of items remaining under this contract after the effective date of the price revision, itemized so far as is practicable in the manner prescribed by Form DD 784 or the equivalent Government form; (ii) an explanation of the difference between the original (or last preceding) estimate and the new estimate; (iii) such relevant shop and engineering data, cost records, overhead absorption reports and accounting statements as may be of assistance in determining the accuracy and reliability of the new estimate; (iv) a statement of experienced costs of production hereunder to the extent that they are available at the time or times of the negotiation of the revision of prices hereunder; and (v) any other relevant data usually furnished in the case of negotiation of prices under a contract. The Government may make such examination of the Seller's accounts, records and books as the Contracting Officer may require and may make such audit thereof as the Contracting Officer may deem necessary.

(6) *Negotiations.*

(a) Upon the filing of the statements and data required by Clause (5) of this Supplement, the Seller and the Buyer will negotiate promptly in good faith to agree upon prices for items to be delivered on and after the effective date of the price revision. Negotiation for price revisions under this Supplement shall be conducted on the same bases, employing the same types of data (including, without limitation, comparative prices, comparative costs, and trends thereof) as in the negotiations of prices under a new contract.

(b) After each negotiation the agreement reached will be evidenced by a supplemental agreement stating the revised prices to be effective with respect to deliveries on and after the effective date of the price revision (or such other later date as the parties may fix in such supplemental agreement).

(7) *Disagreements.*—If within 120 days after the date on which the statements and data are required pursuant to Clause (3) of this Supplement to be filed (or such further period as may be fixed by written agreement) the Buyer and the Seller fail to agree to revised prices, the failure to agree shall be deemed to be a disagreement as to a question of fact and shall be submitted for decision of the Contracting Officer having cognizance of the prime contract. He shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Buyer and the Seller. Within 30 days from the date of receipt of such copy, both the Buyer and the Seller shall have the right of appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary of the service involved, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious

or arbitrary or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive and the prices so fixed shall remain in effect for the balance of the contract or until any subsequent effective date of price revision authorized by this Supplement. In connection with any appeal proceeding under this Supplement, the Buyer and the Seller shall both be afforded an opportunity to be heard and to offer evidence in support of their positions. Pending final decision of a disagreement hereunder, the Seller shall proceed deligently with the performance of the contract and in accordance with the Contracting Officer's decision.

(8) *Payments.*—Until new prices shall become effective in accordance with this Supplement the prices in force at the effective date of the price revision shall be paid upon all deliveries, subject to appropriate later revision made pursuant to Clause (6) or (7) or (9), 2., (B), of this Supplement.

(9) *Termination Provisions.*—For any of the purposes of the Termination Clause of this contract (including, without limitation, the computation of the "total contract price" and "the contract price of work not terminated"), the contract price of delivered articles shall be deemed to be:

1. For all items delivered prior to the effective date of the price revision, the contract price (giving effect to any prior revisions under this Supplement) applicable to each such item;
2. For all items delivered on or after the effective date of the price revision:
    (A) The contract price as revised in accordance with this Supplement, if such revision shall have [been] agreed upon; and
    (B) If such revision shall not have been agreed upon then such estimated prices as the Seller and the Buyer with the approval of the Contracting Officer may agree upon as reasonable under all the circumstances and in the absence of such agreement and approval, such reasonable prices as may be determined in accordance with the Clause herein entitles [sic] "Disagreements".

As a result of any redetermination petitioner might be required to refund amounts received under the purchase orders or General Electric might be required to pay additional sums to petitioner. When price redetermination negotiations were completed, new purchase orders would be executed, reflecting the corrected price of the items.

Under its accounting practice, petitioner set up an account receivable due from General Electric when each item was billed at the current purchase order price. The sales account was credited with the full amount so billed at the time of the billing.

The following entries were made on petitioner's books as of January 31, 1959, the last day of its fiscal year:

| | | |
|---|---|---|
| Provision for contract readjustment | $55, 649. 02 | |
| Reserve for contract readjustment | | $55, 649. 02 |
| To provide for contract price adjustments per H.H. & M. worksheet. | | |
| Provision for contract readjustment | 811, 134. 24 | |
| Reserve for contract readjustment | | 811, 134. 24 |
| To provide a reserve for estimated refunds on price redeterminable jobs not yet completed. | | |

Petitioner reported gross sales on its income tax return for the taxable year ended January 31, 1959, in the amount of $10,513,239.40, which represents gross sales reduced by the amount of $866,783.26, the balance of the "Provision for contract readjustment." Thus, gross sales prior to the adjustment were $11,380,022.66.

Petitioner reduced the accounts receivable on its books by $866,783.26, the amount of its "Reserve for contract readjustment."

The $55,649.02 item entered on petitioner's books represents initial proposals made by petitioner to General Electric for refunds under price redeterminable contracts. The amount was calculated by petitioner's cost accountant, whose primary functions were the preparation and submission of the price redetermination proposals on price redeterminable contracts and the preparation and submission of claims pertaining to canceled Government contracts. In reaching his determination, the cost accountant made an analysis of the total cost, including profit, that had been incurred on specific jobs. He took into consideration the cost of direct labor, direct material, outside purchases, outside services, charges for overhead, and profit.

The $811,134.24 item entered on petitioner's books is an amount which petitioner estimated would have to be refunded to General Electric under price redeterminable contracts. None of this amount had been proposed by petitioner to General Electric as refundable as of January 31, 1959.

The amounts entered on its books represented petitioner's unilateral proposals and estimates of refunds which it would have to make under its price redeterminable contracts with General Electric.

Fixed price redeterminable contracts, such as petitioner had with General Electric, are used with respect to new items where the Government or a prime contractor is uncertain at the time of the making of the contract as to the production costs of the item and is unable to make a reasonable estimate of such costs. No negotiations took place between petitioner and General Electric and no refunds were made in regard to any of the reserve in issue here during petitioner's fiscal year ended January 31, 1959.

Refund proposals submitted by petitioner to General Electric in price redetermination negotiations subsequent to January 31, 1959, with respect to contracts to which the reductions here involved related were larger than the amount of the reserve established by petitioner as of January 31, 1959.

The $866,783.26 here involved related to 64 original purchase orders of which 34 were dated subsequent to January 1, 1958, and 30 were dated prior to January 1, 1958.

Petitioner entered amounts in a "Reserve for contract readjustment" account on its ledger for years prior to and subsequent to its fiscal year here in issue.

The balance in petitioner's "Reserve for contract readjustment" account on February 1, 1958, was $14,003.20. On August 15, 1960, petitioner filed a claim, for refund of taxes paid in the amount of $157,842.36 for its fiscal year ended January 31, 1958, based upon its agreement to refund $303,543 to General Electric "on selling prices changed in the fiscal year ended January 31, 1958."

Petitioner made refunds of undisclosed amounts with respect to its billings to General Electric during its fiscal year ended January 31, 1959, on undisclosed dates subsequent to January 31, 1959.

Respondent in his notice of deficiency increased petitioner's income as reported on its return for its fiscal year ended January 31, 1959, by the amount of $866,783.26 with the following explanation:

Reserve for contract readjustment on completed contracts that are subject to price redetermination, where no fixed or determinable amount has been agreed upon, held not deductible. No deduction would be allowed under Section 1482 of the Internal Revenue Code, without repayment.

OPINION

Petitioner contends that the "Reserve for contract readjustment" account set up on its books was a proper method of accounting in accord with accepted accounting principles and clearly reflected its net income. Petitioner concludes from this premise that under sections 446 and 451 of the Internal Revenue Code of 1954,[1] it properly reduced its gross sales by the amount of this reserve in computing its taxable income.

Respondent argues that sections 1341 and 1482 [2] set forth an exclu-

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.
SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.
(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.
SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION.
(a) GENERAL RULE.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.
[2] SEC. 1341. COMPUTATION OF TAX WHERE TAXPAYER RESTORES SUBSTANTIAL AMOUNT HELD UNDER CLAIM OF RIGHT.
(a) GENERAL RULE.—If—
(1) an item was included in gross income for a prior taxable year * * *
(2) a deduction is allowable for the taxable year * * *
(3) the amount of such deduction exceeds $3,000,
then the tax imposed by this chapter for the taxable year shall be the lesser of the following:
(4) the tax for the taxable year computed with such deduction ; or
(5) an amount equal to—
(A) the tax for the taxable year computed without such deduction, minus
(B) the decrease in tax under this chapter * * * for the prior taxable year * * * which would result solely from the exclusion of such item * * * from gross income for such prior taxable year * * *
* * * * * * *
(b) SPECIAL RULES.—
* * * * * * *
(2) Subsection (a) does not apply to any deduction allowable with respect to an item which was * * * stock in trade * * * or property held by the taxpayer primarily

sive congressional scheme for handling price redeterminable contracts involving Government procurement and that petitioner is therefore required to report the full amount of the contract prices. Respondent states that the Internal Revenue Code contains no provision for a reserve for repayments being considered in determining taxable income.

We agree with respondent that the enactment of sections 1482 and 1341 was a congressional expression that price redeterminable subcontracts should be handled in the manner outlined therein. It is apparent from the congressional reports accompanying the Technical Amendments Act of 1958 [3] that the new sections were designed to give "relief" to subcontractors, which relief would not have been necessary had Congress contemplated that subcontractors could set up reserves for refunds estimated to be due another under price redeterminable contracts and adjust income thereby for Federal income tax purposes.[4]

Sections 1341 and 1482 are the only provisions of the Internal Revenue Code relating directly to the treatment of price redeterminable subcontracts where the refund is to someone other than a governmental agency.

In *Overlakes Corporation*, 41 T.C. 503 (1964), we held that a contractor under a renegotiable Government contract was not entitled to deduct a similar reserve for amounts refundable to the U.S. Government under such contract. In that case we stated (p. 515):

for sale to customers * * *. This paragraph shall not apply if the deduction arises out of payments or repayments made pursuant to a price redetermination provision in a subcontract entered into before January 1, 1958 * * *

SEC. 1482. READJUSTMENT FOR REPAYMENTS MADE PURSUANT TO PRICE REDETERMINATIONS.

(a) GENERAL RULE.—If, pursuant to a price redetermination provision in a subcontract to which this section applies, a repayment with respect to an amount paid under the subcontract is made by one party to the subcontract (hereinafter referred to as the "payor") to another party to the subcontract (hereinafter referred to as the "payee"), then—

(1) the tax of the payor for prior taxable years shall be recomputed as if the amount received or accrued by him with respect to which the repayment is made did not include an amount equal to the amount of the repayment, and

(2) the tax of the payee for prior taxable years shall be recomputed as if the amount paid or incurred by him with respect to which the repayment is made did not include an amount equal to the amount of the repayment.

(b) SUBCONTRACTS TO WHICH SECTION APPLIES.—Subsection (a) shall apply only to a subcontract which is subject to renegotiation under the applicable Federal renegotiation act.

(c) LIMITATION.—Subsection (a) shall not apply to any repayment to the extent that section 1481 applies to the amount repaid.

(d) TREATMENT IN YEAR OF REPAYMENT.—The amount of any repayment to which subsection (a) applies shall not be taken into account by the payor or payee for the taxable year in which the repayment is made; but any overpayment or underpayment of tax resulting from the application of subsection (a) shall be treated as if it were an overpayment or underpayment for the taxable year in which the repayment is made.

[3] S. Rept. No. 1983, 85th Cong., 2d Sess. (1958), General Explanation, pp. 83–84, 85–86, 1958–3 C.B. 922, 1004–1005, 1006–1007, and Technical Explanation, sec. 66, pp. 214–215, 1958–3 C.B. 1135–1136. Conference Rept. No. 2632, 85th Cong., 2d Sess., 1958–3 C.B. 1188, 1222.

[4] Petitioner does not contend that its contracts were not renegotiable contracts within the meaning of secs. 1482 and 1341.

we have before us a situation where petitioner was attempting to anticipate a price adjustment under a Government contract which was subject to a price redetermination under the Armed Services Procurement Act. That Act, in conjunction with the provisions in the 1939 Code as will be discussed hereinafter, provides for a specific method of relief for handling refunds under Government contracts such as we have here and we do not believe that petitioner is entitled to depart from that scheme and attempt to handle the adjustments by claiming a deduction for a reserve for the recapture of excessive profits on Government contracts.[5]

As to contracts entered into after January 1, 1958, petitioner contends that, since section 1482 was enacted to provide substantially the same benefit to subcontractors making repayments to a party other than a governmental agency as section 1481 provides for contractors and subcontractors who make refunds directly to the United States or one of its agencies, section 1481 (a) (4) [6] should be considered applicable to section 1482. Since section 1482 which was enacted after section 1481 contains no provision similar to section 1481 (a) (4), petitioner's contention is without foundation. In any event in the instant case, petitioner has not established "to the satisfaction of the Secretary or his delegate that a different method of accounting * * * clearly reflects income." Also, petitioner has failed to show how much of the "reserve" in issue is attributable to contracts entered into after January 1, 1958.

The fact that petitioner is an accrual basis taxpayer does not remove it from the provisions of sections 1341 and 1482 or justify its deduction of a reserve for an amount which had not become a fixed liability. *Overlakes Corporation, supra.* In *Holmes Projector Co.* v. *United States,* 105 F. Supp. 690 (Ct. Cl. 1952), certiorari denied 344 U.S. 912, rehearing denied 345 U.S. 914, the court, in discussing that taxpayer's contention that the amounts due under renegotiable contracts did not accrue until the renegotiation was completed, stated (p. 693):

We think there can be no question as to the authority of Congress to tax the full amount of earnings from contracts subject to renegotiation as income for the year in which such amounts were paid or payable under the terms of such contracts, subject to proper adjustments for such year in the event of renegotiation and the reduction in a subsequent year of the total receipts or profits. * * *

---

[5] The section of the 1939 Code to which reference is made contained provisions similar to those of sec. 1481 of the 1954 Code permitting a reduction in income tax for a prior taxable year where a refund has actually been made to the United States or to one of its agencies under a price redeterminable contract.

[6] SEC. 1481. MITIGATION OF EFFECT OF RENEGOTIATION OF GOVERNMENT CONTRACTS.

(a) REDUCTION FOR PRIOR TAXABLE YEAR.—

\* \* \* \* \*

(4) EXCEPTION.—The foregoing provisions of this subsection shall not apply in respect of any contract if the taxpayer shows to the satisfaction of the Secretary or his delegate that a different method of accounting for the amount of the payment, repayment, or disallowance clearly reflects income, and in such case the payment, repayment, or disallowance shall be accounted for with respect to the taxable year provided for under such method, which for the purposes of subsection (b) and (c) shall be considered a prior taxable year.

Section 1482(a)(1) specifically refers to the amount "received or accrued."

Petitioner accrued the amounts due under the terms of the contracts as gross sales on its books when it billed General Electric and it does not specifically contend that this was not proper. Rather, it claims not to have "earned" the amounts it placed in reserve. Petitioner had established a legally enforceable right to receive the amounts as fixed payments for sales under the contracts. *Commissioner* v. *Hansen*, 360 U.S. 446 (1959). In fact, insofar as the evidence in this case shows, petitioner may have actually received the payments. But see *Commissioner* v. *Hansen*, *supra*. While petitioner had made a unilateral determination that amounts would have to be refunded, the claim was contingent and unenforceable. *Overlakes Corporation*, *supra*. By far the largest part of the reserve was at best an estimate arrived at by applying "cost factors." Until negotiations or the other procedures provided for under the contracts were completed, and the amounts refundable definitely fixed, the amount of refunds was uncertain.

The fact that petitioner's establishment of a reserve for contract refund may have been in accord with generally accepted accounting principles is not necessarily determinative in accounting for income for Federal income tax purposes where the statutory scheme requires a different method. *American Automobile Association* v. *United States*, 367 U.S. 687 (1961), and *Schlude* v. *Commissioner*, 372 U.S. 128 (1963).

*Decision will be entered for respondent.*